UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

Case No. 17-cr-20617

v.

HON. MARK A. GOLDSMITH

JAQUANE SMITH,

    Defendant.
_____/

## OPINION & ORDER
## GRANTING DEFENDANT'S MOTION TO SUPPRESS (Dkt. 16)

Defendant Jaquane Smith is charged with felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). This matter is before the Court on Smith's motion to suppress tangible evidence and statements. An evidentiary hearing on the motion was held on February 1, 2018, and completed February 5, 2018; supplemental briefing followed. For the reasons that follow, the Court grants the motion.

### I. BACKGROUND

Around 10:45 p.m. on August 20, 2017, Detroit Police Department ("DPD") Officers Quinton Jackson, Xiong Vang, and Matthew Morrison were on patrol on the east side of Detroit. 2/1/2018 Tr. at 11 (Dkt. 20); 2/5/2018 Tr. at 33 (Dkt. 21). The officers were part of DPD's Tactical Response Unit ("TRU"), a "proactive" unit whose primary duty, according to Jackson, was to "try and prevent crimes from happening rather than just responding to them." 2/1/2018 Tr. at 55. While traveling west on Brentwood Street during their routine patrol that night, the officers encountered a pickup truck parked on the northern curb of the one-way street – to the right of the police cruiser.

1

Id. at 78. Standing on the driver's side of the pickup were two men,[1] one of whom was Smith. Id. at 11; 2/5/2018 Tr. at 34. A third man was seated in the driver's seat of the pickup truck. 2/1/2018 Tr. at 17.

At this point, the stories of the officers and Smith diverge. Vang, who was seated in the rear passenger seat of the police cruiser, testified that the officers, while in their cruiser, approached the pickup truck to inform the individuals in and around the truck that they were impeding traffic and "to tell them just to keep it moving." 2/1/2018 Tr. at 13. As they approached in their cruiser, Vang claims that Smith began to "blade" the right side of his body, or "turn his right side away from me concealing it" so that Vang would not be able to see it. Id. at 17-18. As Smith was blading his right side, Vang supposedly saw a heavy object swing in Smith's cargo pants pocket. Id. at 18. He testified that he saw an L-shaped bulge in that pocket, which he believed to be a handgun, based on his experience as an officer. Id. at 19. Vang did not alert his fellow officers of this suspicion, id. at 42-43, supposedly because he did not want to alert Smith that he was going to further investigate, id. at 50. However, Jackson later acknowledged that he and his fellow officers had coded language ("he's ripped") which they could use to communicate to each other that an individual was armed, without detection by the suspect or other non-police personnel present. Id. at 70.

According to Vang, Jackson asked the men if they had any firearms, and all three responded no. Id. at 20. Jackson next asked if it was okay to check for firearms, and all three men supposedly consented. Id. at 21. Vang also testified that Smith appeared nervous and uncomfortable. Id. at

---

[1] Vang and Jackson both testified on direct examination that the two men were "standing in the middle of the street." 2/1/2018 Tr. at 13, 60. It was elicited from both on cross-examination that the two men were actually standing next to the truck, which was next to the curb, and that the men were not impeding traffic. Id. at 38-39, 78.

2

20. However, Vang's report makes no reference to asking for, or obtaining, consent to search.[2] Id. at 49. Nor does it mention Vang's impression that Smith seemed uncomfortable. Id. After supposedly obtaining consent to search, Vang and Jackson exited the vehicle. Id. at 23. Jackson directed Smith to walk towards Vang, who proceeded to frisk Smith and located the handgun in his pocket. Id. at 23-24.

Jackson's testimony provided a largely similar story, including his observation that Smith bladed his body away from the officers, and that he saw an L-shaped bulge in Smith's pocket. Id. at 67-68. But certain key facts were missing from his report. Jackson testified that the men gave consent to search them, id. at 67, though this detail is not referenced in his police report, id. at 86. He also testified that, towards the beginning of the encounter, the man sitting in the driver's seat of the car, Ricardo Young, would not keep his hands visible, despite being asked to do so multiple times. Id. at 65-66. That fact also did not make its way into his report. Id. at 86.

Jackson also testified that, after being granted consent to search, he shined his flashlight on Smith "just to reassure that there was a weapon in his pocket." Id. at 69. Then, upon exiting the vehicle, he physically touched Smith to slide him over to Vang to be searched, though he did not pat Smith down before or during this touch. Id. at 83. Jackson also testified that Vang, after finding the weapon in Smith's pocket, alerted his fellow officers by saying "he's ripped." Id. at 70.

Smith had a different recollection of the encounter. He testified that the officers approached the pickup truck and asked if anybody had called in a disturbance; they said that they had not. 2/5/2018 Tr. at 34-35. Then, Smith testified, Jackson asked if any of them had weapons; when they did not respond, Jackson indicated that the officers' "wand or meter is going off so

---

[2] Vang testified that he did not include the consent in his report because he "believed at the time that we already had enough probable cause." 2/1/2018 Tr. at 51.

3

somebody has to have a weapon."³ Id. at 35. According to Smith, none of the men responded to the question, and the officers proceeded to exit the car. Id. at 35. Jackson went directly to Young, and then directed Smith to go towards Vang. Id. at 36. Vang ordered him to put his hands on the bed of the truck, which he did, and then searched him from the top down. Id.

Young also testified at the hearing. He stated that the officers initially asked if anybody called in a disturbance, and that all three men said no. Id. at 9. After the answer, the officers asked them if they had any weapons, because their wand was going off. Id. Young testified that after all three men denied having weapons, the officers asked if they could search them, but that none of the men responded. Id. at 10.

Smith was arrested and eventually charged federally with felon in possession of a firearm. He brought this motion seeking to suppress the gun as the fruits of an illegal stop and frisk in violation of the Fourth Amendment and Terry v. Ohio, 392 U.S. 1 (1968). Smith argues that he was stopped and frisked without reasonable suspicion that he was engaged in criminal activity and dangerous.

## II. ANALYSIS

The Fourth Amendment "is designed to prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals." I.N.S. v. Delgado, 466 U.S. 210, 215 (1984) (internal quotation marks omitted). Warrantless searches "are per se unreasonable under the Fourth Amendment – subject only to a few specifically established and well-delineated exceptions." Katz v. United States, 389 U.S. 347, 357 (1967) (footnotes omitted).

---

³ According to testimony at the hearing, the "wand" is a trick that officers "use to get people to admit that they do have a weapon." 2/1/2018 Tr. at 87. The idea, apparently, is that the officers say that their wand that detects weapons is going off so that the people they are speaking to are more likely to admit that they do indeed have a weapon. When asked during cross-examination if they had indicated to Smith and the other two men that their wand was going off, neither Vang nor Jackson could recall. Id. at 45, 87.

4

"One of those well-delineated exceptions is the consent of the person searched." United States v. Purcell, 526 F.3d 953, 960 (6th Cir. 2008) (internal quotation marks omitted).

Another permitted form of warrantless government action is the Terry stop and frisk, which allows "a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime." Terry, 392 U.S. at 27. For an "on-the-street encounter" between civilians and a police officer, such as the one we have in our case, a "stop" is reasonable if the officer "reasonably suspects" the person stopped "is committing or has committed a criminal offense;" a frisk for weapons is then permitted if the officer "reasonably suspect[s] that the person stopped is armed and dangerous." Arizona v. Johnson, 555 U.S. 323, 326 (2009). An officer must "be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." Terry, 392 U.S. at 21. Thus, "[m]ore than an inchoate and unparticularized suspicion or hunch is needed to stop and frisk an individual." Northrup v. City of Toledo Police Dept., 785 F.3d 1128, 1131 (6th Cir. 2015) (internal quotation marks omitted).

When faced with a motion to suppress based on the Fourth Amendment, the Government must establish by a preponderance of the evidence that the police conduct did not amount to an unreasonable search and seizure. See United States v. Matlock, 415 U.S. 164, 177 n.14 (1974). In its post-hearing supplemental brief (Dkt. 24), the Government contends that the officers had reasonable suspicion to believe that Smith possessed a firearm, because (i) he bladed his body away from the officers in an attempt to conceal the gun from them; (ii) the officers noted an L-shaped bulge in his pocket which had a heavy swing when he turned; (iii) Smith tried to avoid being searched by stepping away from Vang; (iv) the incident occurred in a high-crime area; (v) Smith appeared uncomfortable; and (vi) the incident occurred at night. The Government also notes

in its briefing that the officers testified that Smith consented to the search, though its focus on this argument is minimal.

Smith argues that he was unconstitutionally stopped and frisked. See Def. Supp. Br. at 2 (Dkt. 23). He argues that the officers' testimony was not credible and notes several aspects of the officers' testimony that give pause, including: (i) the officers did not see the bulge in Smith's pocket until after Smith turned away from them, and still managed to see the specific shape of the bulge even though Smith had turned away; (ii) Jackson used his flashlight to illuminate the pocket, even though it was completely turned away from him; (iii) Jackson testified that Smith chose not to blade his body away from the officers until after the officers had asked multiple questions, while Vang claimed it occurred immediately as the officers arrived; (iv) Vang testified that the bulge could have been anything; (v) neither officer who supposedly saw the bulge warned the other before exiting the police cruiser; and (vi) Jackson, despite believing Smith had a gun, made physical contact and took his eyes off Smith without first frisking him. Smith also disputes that the officers obtained consent to search. Additionally, in his opening brief (Dkt. 16), Smith argued that the officers did not have reasonable suspicion that he was engaged in criminal activity, because he could have been licensed to carry a concealed pistol.

Having carefully considered the testimony presented at the hearing, the Court finds that several of the factual assertions that underlie the Government's opposition to the motion have not been substantiated. One critical factual assertion – that Smith consented to the search – is totally without merit and tarnishes the entirety of the Government's case.

Although Vang and Jackson testified that the Smith and the others present consented, the Court's finds that testimony utterly lacking in credibility. Consent would have been an absolute guarantor of the reasonableness of the search. See Purcell, 526 F.3d at 960. Any officer who had secured such consent would surely have recorded that in his or her report, as that would have

effectively insulated the search from any later challenge in court.  Yet both Vang's report and Jackson's report fail to mention consent.  The explanation offered for its omission – that Vang "believed at the time that we already had enough probable cause," 2/1/2018 Tr. at 51 – is particularly lame.  No reasonable officer would have omitted reference to the "gold standard" for validating his search just to save a few keystrokes in typing up a report.  The absence of such a fundamental "fact" is eloquent evidence that the alleged fact never occurred.  See United States v. Covarrubia, 911 F. Supp. 1409, 1411 n.2 (D.N.M. 1994) (finding a Border Patrol agent's testimony not credible because the agent "omitted any reference to these facts in his police report").  Given the dispositive role consent would have played regarding the search, the false testimony about it appears to have been willful.

Other omissions from the report corroborate the conclusion that Vang and Jackson were not credible witnesses.  There is nothing in Vang's report about Smith appearing nervous, nor is there any statement in Jackson's report about the driver of the vehicle refusing to keep his hands visible.[4]  Such "facts" would have been important to establish the reasonableness of the officers' alleged concern for their safety and belief that Smith or others were armed.  See United States v. Pacheco, 841 F.3d 384, 393 (6th Cir. 2016) (explaining that a suspect's nervousness is "relevant to the reasonable-suspicion calculus").  Accordingly, the Court disbelieves that Vang observed Smith appearing nervous and that Jackson saw the driver refuse to keep his hands visible.

Because both Vang and Jackson were not truthful at the suppression hearing, the Court does not believe other points of their testimony, as it is entitled to do.  See United States v. Martinez, 356 F. Supp. 2d 856, 870 (M.D. Tenn. 2005) (applying the doctrine falsus in uno, falsus in omnibus – false in one thing, false in everything – to discredit an agent's entire testimony due

---

[4] If Jackson observed Smith acting nervous or uncomfortable, or if his report reflected that observation, it was not brought out in his testimony.

to certain inconsistencies with the record). Thus, the Court concludes that the testimony regarding "blading" and the observation of a "bulge" in Smith's pocket are similarly not worthy of belief.

Other testimony supports the conclusion that the witnesses testified untruthfully. Both Vang and Jackson testified that, before exiting the car, they noticed an L-shaped bulge in Smith's pocket that they recognized to be a firearm when Smith bladed his body away from them. But they both also testified that they did not verbally warn each other that Smith might be in possession of a firearm so as to not "alert" Smith. Id. at 50. However, Jackson later testified that they do indeed have "a code word that we say to let officers know [when they find a firearm,] but not suspects." Id. at 70. Similarly, Jackson testified that, despite knowing that Smith had a firearm on his person, he did not immediately frisk him upon exiting the car but instead physically touched him to move him to the side so that he could open the door of the truck, all while Smith was only in his periphery. Id. at 83. Further, instead of the officers physically escorting Smith between the officers, they allowed Smith to walk unescorted to be frisked by Vang. See id. at 23 ("My partner, Officer Jackson, then directed [Smith] to come to me.").

If, in fact, they had observed the bulge, why would they not communicate that to each other, at the very least in code? And why would Jackson send an individual he believed armed over to his partner, without physically escorting him? These are not the actions of officers who believed they had witnessed events supporting the inference that Smith was armed and dangerous.

What then is left of the Government's case for opposing suppression? That Smith was in a high crime area at 10:45 p.m.? That hardly suffices to establish reasonable suspicion that Smith was armed and dangerous or that crime was afoot. Those minimal circumstances would describe virtually anyone encountered by police at night in a rough part of town. See United States v.

Caruthers, 458 F.3d 459, 467 (6th Cir. 2006) (explaining that a person being seen late at night in a high-crime area "may not, without more, give rise to reasonable suspicion").[5]

Viewing the entirety of the record, the Court concludes that there are insufficient facts from which to reasonably conclude that the officers had any reasonable suspicion that Smith had been or was engaged in criminal activity or that he was armed and dangerous. The stop and frisk of Smith violated the Fourth Amendment, requiring that the fruits of the search be suppressed.[6]

### III. CONCLUSION

For the above reasons, Smith's motion to suppress is granted.[7]

SO ORDERED.

Dated: April 12, 2018       s/Mark A. Goldsmith
   Detroit, Michigan      MARK A. GOLDSMITH
                                United States District Judge

**CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on April 12, 2018.

                                              s/Karri Sandusky
                                              Case Manager

---

[5] The Government also claims that Smith allegedly avoided being searched, but the testimony regarding that point is only that he moved away to allow the officers a means of passage to the others that the officers sought to interview. 2/1/2018 Tr. at 23 ("[Smith] like stepped aside and he kind of gave us like an opening to go talk to the two men."). There is nothing to support the conclusion that Smith was actively avoiding a search.

[6] Because the Court determines that the stop and frisk was unconstitutional, any statements made as a result of the stop and frisk must also be suppressed. See Wong Sun v. United States, 371 U.S. 471, 485 (1963) ("[V]erbal evidence which derives so immediately from an unlawful entry and an unauthorized arrest as the officers' action in the present case is no less the 'fruit' of official illegality than the more common tangible fruits of the unwarranted intrusion.").

[7] Based on this ruling, it is unnecessary for the Court to address Smith's argument that he could have had a license to carry a concealed weapon and thus there was no reasonable suspicion of criminal activity.